998 F.2d 1016
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
David IRWIN, George Mercer, Charles Sirna, et al.,
Plaintiffs-Appellants,
v.
STATE of Wisconsin and William Flynn, Jr., Executive
Director, Wisconsin State Lottery, Defendants-Appellees.
 No. 92-2509.
 United States Court of Appeals, Seventh Circuit.
 Argued Dec. 7, 1992.
Decided April 28, 1993.
 
 Before CUMMINGS, POSNER and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 We adopt Chief Judge Barbara Crabb's comprehensive opinions granting summary judgment to the defendants.
 
 
 2
 AFFIRMED.
 
 IN THE UNITED STATES DISTRICT COURT
 FOR THE WESTERN DISTRICT OF WISCONSIN
 
 3
 David IRWIN, George Mercer, Charles Sirna, Randall Skowlund,
 
 
 4
 Daniel Brunmeier, Gary Burt, Sharon Danke, Elwyn Dunst,
 
 
 5
 James Engel, Elizabeth Gallenbeck, Thomas Greenlee, Paul
 
 
 6
 Hilmes, Barbara Raether, and Arlene Rentmeester, Plaintiffs,
 
 
 7
 v.
 
 
 8
 STATE OF WISCONSIN and WILLIAM F. FLYNN, JR., Executive
 
 
 9
 Director, Wisconsin State Lottery, Defendants.
 
 OPINION AND ORDER
 June 19, 1992
 91-C-0711-C
 
 10
 Plaintiffs have moved the court to reconsider the order dated April 30, 1992, granting defendants' motion for summary judgment in all but one respect. Plaintiffs contend that defendants' failure to produce documents requested by plaintiffs during the discovery process prejudiced plaintiffs by precluding them from offering additional evidence in support of their claims. Plaintiffs have submitted several documents that they allege defendants did not produce in a timely manner so that plaintiffs could proffer them in opposition to defendants' motion for summary judgment.
 
 
 11
 Defendants reply that plaintiffs did have some of the documents at issue before they filed their response to defendant's motion for summary judgment. As to the documents plaintiffs did not have, defendants contend that plaintiffs did not request some of the documents, that plaintiffs had access to others of the documents but did not ask for copies, and that still other documents were the subject of objections that were never challenged. Additionally, defendants assert that plaintiffs were dilatory in their discovery practices and so should be precluded from arguing that they did not have enough time to present all the evidence in their favor by the deadlines at the summary judgment stage. Finally, defendants contend that plaintiffs are barred from asking for reconsideration of the summary judgment decision because they failed to request an extension of time to gather more evidence, pursuant to Fed.R.Civ.P. 56(f).
 
 
 12
 Motions for reconsideration "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." Keene Corp. v. Int'l Fidelity Ins. Co., 561 F.Supp. 656, 665 (N.D.Ill.1982), aff'd 736 F.2d 388, 393 (7th Cir.1984).[1] "Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the summary judgment motion." Id. To support a motion for reconsideration of a grant of summary judgment based on newly discovered evidence, the moving party is "obliged to show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence [during the pendency of the motion]." Engelhard Indus., Inc. v. Research Instrumental Corp., 324 F.2d 347, 352 (9th Cir.1963), cert. denied, 377 U.S. 923 (1964).
 
 
 13
 The evidence that plaintiffs submit as newly discovered evidence consists of vehicle log reports that plaintiffs requested in their First Request for Production of Documents on November 22, 1991 and that defendants provided in early March 1992; documents produced by Cyneth Dahm at her deposition on March 6, 1992; and documents produced by Donna Dusso at her deposition on April 22, 1992. The record in this case shows none of these documents qualify as newly discovered evidence that plaintiffs could not have discovered and produced during the pendency of the motion if they had exercised the requisite reasonable diligence.
 
 
 14
 Plaintiffs had the vehicle log reports and the Dahm documents in their possession for a minimum of several days before plaintiffs' response to defendants' summary judgment motion was due.[2] Plaintiffs had two choices of what to do with these documents: they could scurry to assess the documents, determine what evidence the documents provided that raised material disputed facts to defeat defendants' motion for summary judgment, and submit the evidence with the brief in opposition; or they could move the court for an order continuing their time for submitting their brief, explaining that they had only recently received new materials and needed time to assess them, pursuant to Fed.R.Civ.P. 56(f).[3] Plaintiffs did neither; they submitted their brief in opposition without asking for a continuance to assess the "new" information, and they did not include any vehicle logs or any materials from the Dahm deposition as evidence to show a material dispute of fact.[4] It is disingenuous for plaintiffs to argue now that with reasonable diligence they could not have submitted the vehicle logs or the Dahm documents during the pendency of the motion for summary judgment.
 
 
 15
 Although plaintiffs had not deposed Donna Dusso before the March due date of their brief in opposition to defendants' motion for summary judgment, their attempt to persuade the court that it should consider documents produced at her deposition on April 22, 1992 suffers several infirmities. First, plaintiffs argue that they requested the documents at issue in Request No. 1 of their First Request for Production of Documents. However, defendants objected to request no. 1 as being "vague, unduly burdensome and as shifting from plaintiffs to defendants the burden, under Fed.R.Civ.P. 34, of designating documents to be discovered.... The defendants affirmatively state that they will make all reasonable efforts to allow plaintiffs to inspect and copy the documents that appear to be relevant to these proceedings...." Defendants' Response to Plaintiffs' Request for Production of Documents, no. 1. Plaintiffs did not respond to defendants' objection by challenging the objection, submitting a more specific written request for documents, filing a motion to compel, or scheduling early depositions.[5] Plaintiffs did not depose Dusso until April 22, after their brief in opposition to defendants' motion for summary judgment was due. The deposition was held before the motion was decided, however, and before plaintiffs submitted vehicle logs to the court on April 28. As with the vehicle logs and the Dahm documents, plaintiffs could have moved the court for a continuance in order to have time to inspect the new documents, but they failed to do so. That failure precludes plaintiffs from asking the court to consider the documents now. "The courts will not delay a case to allow discovery when the discovery sought could have been instituted earlier, especially when there is no reason to believe that it will lead to a denial of the motion." 10A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, Federal Practice and Procedure § 2741 (1983). The "earliest possible use of the discovery procedures seems imperative for a party seeking to avoid summary judgment." Id.
 
 
 16
 Even if I were to grant plaintiffs' motion for reconsideration to allow submission of their documents, nothing in those documents would provide a basis for altering my conclusion that plaintiffs have failed to set forth facts showing that there is a genuine issue for trial.[6] It is notable that although plaintiffs' motion for reconsideration and memorandum of law in support of the motion state that plaintiffs have been severely prejudiced by defendants' failure to produce these documents earlier, plaintiffs do not explain how any of the documents serve to raise a material issue of fact.
 
 
 17
 About half of plaintiffs' current submissions are vehicle logs. These are identical in kind to the logs that plaintiffs submitted on April 28, 1992, which I addressed in footnote 19 of my April 30 opinion and in footnote three above. The earlier submitted vehicle logs failed to raise a material dispute whether there existed reliable records of actual overtime hours worked by plaintiffs or whether defendants agreed that plaintiffs' residences would be designated as their district offices. Submitting more of the same kind of records does not cure the immateriality of the logs.
 
 
 18
 The other half of plaintiffs' submissions consist primarily of documents discussing updating of position descriptions for state exempt employees, various memoranda regarding state vehicle policies, letters between counsel regarding discovery disputes, and copies of lottery board questionnaires and forms. Plaintiffs do not explain how any of these documents raise a material issue of fact about plaintiffs' claims.
 
 
 19
 Another of plaintiffs' submissions is an October 17, 1988 letter to all lottery employees from defendant Flynn in which he addresses overtime pay for the lottery start-up period. The Flynn letter is remarkably similar to the 1988 memorandum to lottery employees from R.D. Markham, which I discussed at page twenty-eight of my April 30 order. Both documents inform employees that they will be paid overtime compensation in conformity with the Fair Labor Standards Act. As I pointed out in the opinion, these documents do not call into question defendants' good faith in not paying overtime compensation to its employees who were considered exempt, because under the FLSA, exempt employees need not be paid for overtime work.
 
 
 20
 The other document in plaintiffs' new submissions that I will address specifically is the 1988 memorandum from Dale Langer regarding state vehicles that some field service representatives were permitted to take home at night. The memorandum lists various field service representatives and the reasons why they were permitted to take their cars home. In several cases, the reason given is that "headquarters is his home." Although plaintiffs do not explain the relevance of this document, I assume that they are proposing that the document is evidence of a contract between some field service representatives and defendants that the field service representatives' residences would be designated as their home bases so that plaintiffs could begin and end their work days at their homes.
 
 
 21
 I will direct plaintiffs' attention once again to the April 30 order. Beginning on page thirty-nine, I discuss the fact that even if plaintiffs could raise a material factual dispute regarding whether defendants had entered into such contracts, the contracts would be invalid and unenforceable because they extended beyond the authority of the lottery board. The Langer memorandum is immaterial because even if I were to consider it, it would not change the outcome of the case.
 
 
 22
 Plaintiffs' motion for reconsideration will be denied. They have not shown that they were diligent in their pursuit of discovery, that any of their proffered evidence is newly discovered, or that any of their proffered evidence is material.
 
 ORDER
 
 23
 IT IS ORDERED that plaintiffs' motion to reconsider this court's April 30, 1992 order granting summary judgment to defendants is DENIED.
 
 
 24
 /s/ BARBARA B. CRABB
 
 
 25
 /s/ District Judge
 
 OPINION AND ORDER
 April 30, 1992
 91-C-0711-C
 
 26
 This is a civil action brought by field sales representatives employed by the Wisconsin State Lottery against defendants State of Wisconsin and William F. Flynn. Jurisdiction is invoked pursuant to 29 U.S.C. § 216(b), the Fair Labor Standards Act. Plaintiffs contend that they have been denied overtime compensation due them under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq., and bring this action to secure overtime compensation and other remedies provided by FLSA. Plaintiffs contend also that defendants have breached their employment contract, retaliated against them for bringing this action, violated the state whistleblower law, Wis.Stat. § 895.65, and violated their state and federal constitutional rights of free speech.
 
 
 27
 The case is before the court on defendants' motion to dismiss portions of the complaint; plaintiffs' motion for partial summary judgment; and defendants' motion for summary judgment. Defendants maintain that they do not owe plaintiffs more back pay overtime compensation than has been offered, that they have not breached a contract with plaintiffs, and that they have not violated plaintiffs' constitutional rights or retaliated against plaintiffs in any way.
 
 
 28
 To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1412 (7th Cir.1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991). Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. Celotex, 477 U.S. at 322.
 
 
 29
 Defendants' uncontested motion to dismiss will be granted on the issue of class certification and their uncontested motion to dismiss James Caveney from the suit will be granted. I conclude that plaintiffs have shown no grounds for granting them partial summary judgment as to the issue whether defendants have admitted liability for back pay and will deny that motion. It is not possible to determine on the present record the purpose of defendants' motions to dismiss and for summary judgment as to the times before which each plaintiff is barred from receiving overtime compensation; therefore, the motions will be denied. I conclude that plaintiffs have failed to establish the existence of the essential elements on which they bear the burden of proof at trial, or to put into dispute any of the elements of claims on which defendants bear the burden of proof. Accordingly, defendants' motion for summary judgment on all other claims will be granted.
 
 
 30
 For the sole purpose of deciding the motions before the court, I find from the parties' proposed findings of fact that the following facts are undisputed.
 
 UNDISPUTED FACTS
 
 31
 Plaintiffs Brunmeier, Burt, Danke, Dunst, Engel, Gallenbeck, Greenlee, Hilmes, Irwin, Mercer, Mosby, Raether, Rentmeester, Skowlund, and Sirna are or were full-time or part-time field sales representatives employed by the Wisconsin Lottery Board. Defendant State of Wisconsin is a public agency within the meaning of 29 U.S.C. § 203(x) and an employer within the meaning of 29 U.S.C. § 203(d). Defendant Flynn is and was at all times material to this lawsuit the executive director of the Wisconsin Lottery Board and was an employer of all full and part-time plaintiffs employed with the lottery board within the meaning of 29 U.S.C. § 203(d) in that defendant Flynn acted directly in the interests of the State of Wisconsin in relation to its employees, including plaintiffs.
 
 
 32
 During the period from about August 1, 1988 to the time this suit was filed, plaintiffs were required to work in excess of forty hours per week without being paid overtime compensation for those hours worked in excess of forty hours per week.[1] Plaintiffs did not consent or agree to the loss of overtime pay under the FLSA for the period of time from August 1, 1988 to the present.
 
 
 33
 The Wisconsin Lottery Board, an agency of defendant State of Wisconsin, was the subject of an investigation by the United States Department of Labor regarding noncompliance with provisions of the FLSA as applied to field service representatives. The Department of Labor made findings that the field sales representatives employed by the lottery board were not exempt from the provisions of FLSA and that defendants had not complied with the provisions of FLSA as applied to the field service representatives. Defendants have not admitted the correctness of these findings.
 
 
 34
 Promptly after learning that FLSA would become applicable to the State of Wisconsin in 1985, the State of Wisconsin had determined which of its classifications of employees would be exempt from the provisions of FLSA pursuant to 29 U.S.C. § 213(a) and the administrative rules applicable to 29 U.S.C. § 213(a). When the lottery board was being formed, a determination was made, separate from any consideration of FLSA exemption, that the field sales representative position would best be classified as an "Administrative Assistant 3" classification. It was recognized at the time that it might be appropriate to revisit the classification issue once employees gained more experience in the new position. Only after the classification of this position was decided upon was any reference made to the classification lists to determine whether the position would be exempt or non-exempt for FLSA purposes.
 
 
 35
 Through a memorandum to the Department of Labor dated January 9, 1991, Jean Whitcomb of the Wisconsin Department of Employment Relations confirmed her understanding, based on a prior meeting with the Department of Labor, that the lottery board and the Department of Employment Relations had to show that the field service representatives had been employed in bona fide "administrative" capacities or as "outside salesmen," and outlined briefly some of the parameters of the showing that needed to be made.
 
 
 36
 Through a memorandum to the Department of Labor dated January 9, 1991, Jean Whitcomb confirmed that, at a meeting with the Department of Labor, it was noted that "[i]f employees understand that the information provided during the investigation will be used in the immediate future to determine FLSA status, class titles and pay range levels, the information provided may be more complete and accurate.... The Lottery and DER will make sure that the multiple uses of the information is clearly communicated." These multiple purposes were communicated clearly to the field sales representatives employed by the lottery board through various memoranda.
 
 
 37
 Prior to the commencement of this action, the lottery board had decided not to contest the conclusions of the Department of Labor investigation that the field service representatives were not exempt from FLSA. Upon receipt of those conclusions, the lottery board agreed to work with the department in calculating the amount of back overtime compensation to be paid to field service representatives and to begin tracking hours worked by field service representatives in order to pay overtime compensation to those employees as it came due. This intent was communicated to the field service representatives prior to the commencement of this action. By deciding not to contest the conclusions of the Department of Labor and by agreeing to work with the department in calculating the amount of back overtime compensation and to commence paying overtime as it came due, defendants made no admission that field service representatives were not exempt from FLSA. The lottery board has been paying overtime compensation to the field service representatives on the basis of actual time worked since June 14, 1991.
 
 
 38
 Pursuant to the instructions of the Department of Labor, the lottery board established a test period during which the overtime of field service representatives was tracked. The results of the test period were extrapolated to apply to the period during which recovery was to be granted--from January 1, 1989 until the lottery board commenced tracking actual overtime hours and compensating the field service representatives on that basis. The lottery board followed the Department of Labor's instructions; after conducting the test period and making the calculations, the board submitted the documentation and the proposed back pay offers to the department.
 
 
 39
 The Department of Labor approved explicitly the back pay offers and the calculations made by the lottery board, and determined that they were the best estimates of the back pay owing that could be made. Department of Labor assistant district director Errol Patenaude sent a letter to Mary Jo Hewett of the Wisconsin Department of Employment Relations approving the process by which the back pay calculations were made and approving the process by which the back pay offers were to be made. In materials delivered to each field service representative on January 27, 1992, back pay offers were made to all past and present field service representatives, to commence February 3, 1992. Plaintiffs Irwin, Skowlund and Dunst received offers of back pay overtime compensation on January 23, 1992, for the period from July 1, 1991 through October 14, 1991, the time period when the geographical drop-off points for lottery ticket distribution were being utilized. Plaintiffs Irwin, Skowlund and Dunst rejected the offer of back pay because they believed the calculation of the number of overtime hours they had worked was inaccurate. On January 27, 1992, plaintiffs received the lottery board memorandum that included an offer of payment for back pay overtime compensation for the period of January 1, 1989 through June 14, 1991. After reviewing the offer of settlement, plaintiffs concluded that the number of overtime hours calculated was inaccurate, that the settlement figures were not calculated at one and one-half times the plaintiffs' hourly rate of pay, and that there was no payment for liquidated damages. Defendants were aware that plaintiffs had worked in excess of forty hours per week during the period from August 1, 1988 to the time this suit was filed.
 
 
 40
 Pursuant to the procedures approved by the Department of Labor, a teleconference was held; each of the district sales offices was connected and all of the past and present field officers had the opportunity to participate in the teleconference.
 
 
 41
 The back pay calculations were based on 29 C.F.R. § 548, pertaining to salaried employees, and the instructions of the Department of Labor. The department required that these calculations be based on the results of the test period it instructed the lottery board to conduct during the investigation; the department considered other records to be unreliable because the field service representatives had been considered exempt and paid on a salary basis. Time that a field service representative spent traveling from the representative's own home either to the district office or to the first retailer and time spent traveling either from the district office or the last retailer to a field service representative's home was excluded from calculations based on both the applicable law and upon the instructions of the Department of Labor.
 
 
 42
 The Department of Labor did not require defendants to pay liquidated damages in addition to the overtime compensation it did order.[2]
 
 
 43
 By a letter dated December 29, 1991, the lottery board made the first biennial report to the Wisconsin Legislature, under Wis.Stat. § 565.45, on the effect of the statutory limit on the lottery board's annual expenses--including compensation to retailers--to fifteen percent of the lottery's annual gross sales. If the lottery board were required either to establish drop-off sites for those who wanted to utilize them or otherwise to pay field service representatives for time spent traveling between home and work, the lottery board would jeopardize seriously its ability to keep its annual expenses below the statutory limit of fifteen percent of gross lottery revenues.
 
 
 44
 Plaintiff Mosby accepted the back pay offer made by the lottery board in exchange for a release of all claims she might have to overtime compensation from the period January 1, 1989 to June 14, 1991, as well as any liquidated damages or fees or costs resulting from those claims.
 
 
 45
 In August 1988, Gerald Ziegler, fleet manager for the Wisconsin Department of Administration, made a presentation regarding the state fleet policy at a meeting of the field service representatives of the lottery board. During that meeting Ziegler reiterated the provisions of the state fleet policy as to personal use of state-owned vehicles, including but not limited to travel between home and work. The lottery board has been authorized since its inception to operate a vehicle fleet pursuant to Wis.Stats. § 16.04(1m). Since the inception of the lottery board and pursuant to Wis.Stat. § 16.04(3), the Wisconsin Department of Administration has audited annually the total miles reported by the lottery board on monthly reports of vehicle fleet use in order to assure, in part, that personal mileage use on state-owned vehicles was either nonexistent or was reimbursed by the employee.
 
 
 46
 In the event the Wisconsin Department of Administration determines that an agency maintained practices of allowing its employees to use functionally-assigned state-owned vehicles for personal use, including but not limited to driving between home and work, the authority of that agency to maintain its own fleet under Wis.Stat. § 16.04(3) may be returned to the Wisconsin Department of Administration. In the past five years, the authority of at least seven state agencies to operate their own fleets has been returned to the Wisconsin Department of Administration because the department found inappropriate use of state-owned vehicles and higher than normal cost factors as to state-owned vehicles in those agencies.
 
 
 47
 Since the inception of the lottery board, it has been the uniform state policy set forth in guidelines promulgated by the Wisconsin Department of Administration for the use of state-owned vehicles that miles traveled between an employee's home and work are generally nonbusiness miles. Upon or shortly after being hired by the lottery board, each plaintiff received a "Wisconsin Lottery Sales Representative Manual" that stated: "Under no circumstances is a Wisconsin State Lottery vehicle to be used for personal use. This includes commuting to and from your official work station. Cars are to be left at the District Sales Offices at night and on weekends, holidays, etc." Upon or shortly after being hired by the lottery board, each plaintiff signed a "State of Wisconsin Pool and Functional Pool Vehicle Use Agreement" acknowledging that the plaintiff either had read or reviewed the "State of Wisconsin Fleet Policies and Procedures" promulgated by the Wisconsin Department of Administration.
 
 
 48
 Shortly after being hired by the lottery board, each plaintiff received an appointment letter that indicated that the city in which the plaintiff's district office was located would be that person's respective headquarters city. Nowhere in any of the appointment letters, or elsewhere in any of the records of the lottery board, is there any written approval, authorized by the lottery board, for plaintiffs to consider their headquarters cities to be any place other than the district offices to which they were assigned. From the lottery board's inception, except for certain variations during the start-up period, the fleet policy applicable to all state employees has been applied to all lottery board employees.
 
 
 49
 On June 7, 1991, Wisconsin Lottery Board sales director Donald Walsh issued a memorandum to all sales division field staff that, effective July 1, 1991, a) all state-owned vehicles used on one day routes were to be returned to headquarters cities; b) state-owned vehicles could be taken to the homes of field service representatives on multi-day routes where relative distances between last and first retailer, headquarters cities and the field service representative's home justified it, and c) in addition to the district offices, three drop-off sites would be established to which the vehicles could be returned.
 
 
 50
 On August 22, 1991, defendants issued a memorandum outlining how communications regarding issues involved in this action should be handled within the lottery. The memorandum, addressed to all lottery employees, stated in relevant part:
 
 
 51
 A lawsuit has been filed in federal court by Dave Irwin, Randy Skowlund, Chuck Sirna and George Mercer alleging violations of the overtime and retaliation provisions of the FLSA. The [Wisconsin] Department of Justice is defending the Lottery Board. Since this is pending litigation, our attorney at DOJ has advised us that any communications between the Lottery Board and any of these four individuals as to any of the issues in the lawsuit must be made through their attorney and our attorney. Any communications with any of these four employes relating to overtime compensation for FSRs, the reorganization, the FSR positions recently offered, the fleet policy, or whether travel time between work or home incurred by FSRs is compensated should be made through the attorneys....
 
 
 52
 Employes other than these four employes could also make inquiries as to these issues. We want to assure that such inquiries are answered as effectively and consistently as possible without interfering with ongoing operations and without jeopardizing the Board's proper representation in the lawsuit. Should any of you receive an inquiry from anyone other than these four employes, therefore, as to any of these issues ... please direct the person making the contact to Don Walsh or Diane Harmelink....
 
 
 53
 On October 11, 1991, the lottery board eliminated the practice begun in June 1991 of providing secure drop-off sites in addition to district offices for the return of vehicles. On October 14, 1991, Walsh issued a memorandum to this effect to all sales division field staff. Defendants eliminated the drop-off sites after they learned that the lottery board would have to compensate field service representatives for the time they spent transporting state-owned vehicles to those sites.
 
 
 54
 The lottery board responded to the issue whether the plaintiffs were exempt under FLSA by implementing new timekeeping procedures and by examining the accuracy of the position descriptions questioned by the Department of Labor in its FLSA investigation.
 
 OPINION
 
 55
 Plaintiffs contend that defendants owe them more overtime compensation for the period of January 1, 1989 to June 14, 1991 than defendants have offered to pay, that defendants breached an employment contract with them, and that defendants retaliated against them in violation of the First Amendment and state constitutional and statutory law for bringing this action. I will consider each of these claims in order. First, however, I will address two preliminary issues.
 
 
 56
 Defendants have moved to dismiss plaintiff James Claveney from this action because he has not filed a consent to be a party plaintiff in response to the Amended Notice to Potential Class Members issued on January 10, 1992. Plaintiffs agree that he should be dismissed. Therefore defendants' motion will be granted.[3]
 
 
 57
 Defendants contend also, and plaintiffs do not disagree, that the named plaintiffs are not entitled to bring this action on behalf of "all other employees of the Wisconsin State Lottery, past and present, similarly situated." Defendants are correct. "An individual employee cannot become a party to an action under 29 U.S.C. § 216(b) unless he or she specifically files a consent form with the district court." State of Nevada Employees' Ass'n, Inc. v. Bryan, 916 F.2d 1384, 1391 (9th Cir.1990). In this regard, actions under the FLSA are different from class actions brought under Fed.R.Civ.P. 23. Rule 23 requires prospective class members to "opt out" or be included in an action; the FLSA requires prospective parties to "opt in" affirmatively to be included. Plaintiffs may not skirt the "opt in" requirement of the FLSA by naming as plaintiffs employees who have chosen not to opt in. Defendants' motion to dismiss all unnamed plaintiffs will be granted.
 
 
 58
 A. Denial of Overtime Compensation under FLSA
 
 1. Overtime compensation
 
 59
 29 U.S.C. § 207(a)(1) provides, in relevant part, that
 
 
 60
 ... [N]o employer shall employ any of his employees who in any workweek is engaged in commerce for a workweek longer than forty hours, unless such employees receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.
 
 29 U.S.C. § 213(a) states that
 
 61
 [t]he provisions of section [ ] ... 207 of this title shall not apply with respect to
 
 
 62
 (1) any employees employed in a bona fide ... administrative ... capacity, or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary [of the United States Department of Labor], ...); ...
 
 
 63
 When the Wisconsin State Lottery Board was being formed, a determination was made that the field sales representative position would best be classified as an "Administrative Position 3" and that the position was thus exempt under § 213(a) from the § 207 requirement that overtime be paid for hours worked in excess of forty. After an investigation, the United States Department of Labor concluded that lottery board field service workers were not exempt under § 213(a). The lottery board decided not to contest the Department of Labor's conclusions; rather, the board worked with the department to calculate the amount of back overtime compensation the board owed to its field service representatives and to begin tracking actual overtime hours. On orders from the Department of Labor, the lottery board established a test period during which it tracked the overtime hours of field service representatives. Then the board extrapolated the test results to apply to the period from January 1, 1989, the time from which it was ordered to pay back overtime compensation, until June 14, 1991, the date on which the board began paying overtime for actual hours worked. The Department of Labor ordered the lottery board to calculate back pay in this fashion because of a lack of reliable records upon which to calculate overtime hours actually worked.[4]
 
 
 64
 It is the method defendants used to calculate the back pay to which plaintiffs take exception. They contend that reliable records did exist--their own records--upon which actual overtime rather than extrapolated overtime could have been calculated. They contend that they were not paid the statutorily required "time and a half" for the overtime they worked between January 1, 1989 and June 14, 1991, and that the lottery board improperly failed to count the time plaintiffs spent driving between their homes and their respective district offices or the first and last retailers on their routes.
 
 
 65
 Plaintiffs' contentions fail on all three counts. First, plaintiffs have offered no proposed findings of fact that such records exist. In the affidavits to which they refer in their brief in opposition to defendants' motion for summary judgment, plaintiffs do not provide any specific details of the purported records or the records themselves, but simply state that there exist accurate and reliable records.[5] Such conclusory statements do not suffice to defeat a motion for summary judgment. Celotex, 477 U.S. at 322-23 (holding that "[t]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). At the summary judgment stage of a lawsuit, the parties are required to put forward whatever evidence they have; they may not stand on a statement that they have evidence that they will produce later. Id. Plaintiffs have not put forward anything more than a statement that reliable records exist; from this I can make no determination of the validity of these records or their sufficiency.[6]
 
 
 66
 In the absence of the means to calculate the actual amount of overtime that plaintiffs worked, the Department of Labor directed defendants to calculate from hours extrapolated from a test period.[7] When the test period was over, defendants calculated the overtime compensation due plaintiffs by multiplying the extrapolated hours times one and a half.[8] Defendants submitted the documentation for their calculations, the calculations themselves, and the proposed back pay offers to the Department of Labor, which approved both the calculations and the back pay offers. The calculations were based on 29 C.F.R. § 548 as to salaried employees and the department's instructions.[9]
 
 
 67
 Plaintiffs contend that defendants' back pay offers did not meet the standard of § 778.113(a) that pay at the rate of time and one-half is required for all hours worked over forty because the calculations were based on extrapolated rather than actual overtime hours worked. Plaintiffs do not contend that defendants have not offered time and one-half for the extrapolated overtime hours. Given that the Department of Labor determined that the calculations were the best estimates of back pay owing in the absence of any actual reliable records upon which to determine actual overtime hours worked, and given that plaintiffs have not succeeded in showing that the department was wrong about the existence of actual reliable records, I conclude that plaintiffs have failed to show that defendants' offer of back pay overtime compensation did not include the time and one-half rate required by regulation.
 
 
 68
 Plaintiff's final contention regarding back pay overtime compensation is that defendants did not take into consideration travel time between plaintiff's homes and their first or last business appointments or their district offices in computing their numbers of hours worked during the test period. The Portal-to-Portal Act, 29 U.S.C. § 254(a), exempts from overtime compensation "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which [the] employee is employed to perform." Plaintiffs assert that this exemption did not pertain to them because they were required to perform certain employment duties at home, including telephoning, storing and safeguarding defendants' lottery tickets and keeping some records. Plaintiffs have offered no proposed finding of fact in this regard.
 
 
 69
 Plaintiffs do not contend that they should have been paid for the hours they worked on telephoning, record keeping and storing lottery tickets at their homes, but were not. Rather, they contend that they should have been paid for the time they spent traveling to and from work because they performed principal activities while at home. In Steiner v. Mitchell, 350 U.S. 247 (1956), the Supreme Court dispensed with that argument. The Court concluded that "activities performed either before or after the regular work shift ... are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by [§ 254(a)(1) ]." Id. at 256 (emphasis added). Since Steiner, courts have awarded compensation for travel time only where some other activity that was an integral and indispensable part of the principal activities of the employee occurred at the same time as the travel. See Crenshaw v. Quarles Drilling Corp., 798 F.2d 1345, 1350 (10th Cir.1986) (interpreting § 254(a) "not to prohibit overtime compensation when active duties are performed during travel time").[10] Plaintiffs do not contend, nor have they offered any facts in support of a contention, that they performed any integral and indispensable part of their principal job activities while enroute between their homes and their district offices or their first or last business appointments. There is no merit to plaintiffs' claim that defendants should have considered traveling time in their computations of overtime. Defendants' motion for summary judgment on this issue will be granted: the extrapolated hours from which defendants calculated how much back pay overtime they owed plaintiffs was a fair and reliable method of calculation, and defendants were correct in not including travel time in those computations.
 
 2. Liquidated damages
 
 70
 In addition to the back pay overtime compensation to which plaintiffs are entitled, they request liquidated damages, in an additional equal amount, pursuant to 29 U.S.C. § 216(b). Defendants contend that liquidated damages are unavailable to plaintiffs under 29 U.S.C. § 260, which provides that
 
 
 71
 [i]n any action ... to recover ... unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act ..., if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act ..., the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.
 
 
 72
 Under these statutes,
 
 
 73
 doubling [of damages is] discretionary rather than mandatory, but ... [with] a strong presumption in favor of doubling, a presumption overcome only by the employer's 'good faith ... and reasonable grounds for believing that [the] act or omission was not a violation.' ... Double damages are the norm, single the exception, the burden on the employer.
 
 
 74
 Walton v. United Consumers Club, Inc., 786 F.2d 303, 310 (1986) (quoting 29 U.S.C. § 260). In determining whether an employer owes liquidated damages, the "right standard" is whether, viewed objectively, the employer acted in good faith with reasonable grounds for believing that it was not in violation of the FLSA. Id. at 312. "[A] decision made above board and justified in public is more likely to satisfy this test.... Double damages are designed in part to compensate for concealed violations, which may escape scrutiny." Id.
 
 
 75
 Defendants decided that field sales representatives would be classified as "administrative assistant 3's" before they referred to FLSA classification lists to determine whether such a classification would be exempt or non-exempt. At the time the classification decision was made, defendants recognized that the classification might have to be changed once defendants and their employees had some experience in the positions. The appointment letters that plaintiffs received in August 1988 provided explicitly that the field service representative positions were considered exempt. In its investigation of the classification of the field service representatives, the Department of Labor did not require defendants to pay liquidated damages in addition to the overtime compensation it did order.
 
 
 76
 Plaintiffs offer three reasons in support of their contention that defendants' "good faith" and "reasonable grounds" remain in dispute; plaintiffs offered none of these reasons as proposed findings of fact. First, plaintiffs contend that defendants have known since 1988 that several of the field service representatives were working in excess of forty hours per week. Defendants do not dispute this; they answer that the fact is irrelevant as to employees considered exempt.[11]
 
 
 77
 Second, plaintiffs point to a memorandum from R.D. Markham to all lottery employees, allegedly sent in 1988, informing the employees that they would be paid overtime compensation pursuant to the FLSA.[12] This document does not call into question defendants' good faith in not paying overtime compensation to its employees who were considered exempt; under the FLSA, exempt employees need not be paid for overtime work. The document states that "[c]ompensation for overtime will be provided according to the WSEU bargaining agreement [and] the Fair Labor Standards Act." Plaintiffs' appointment letters stated that their positions were not covered by the union bargaining agreement and were exempt under the FLSA. Compensating plaintiffs for overtime under the FLSA was synonymous with not compensating them for overtime.
 
 
 78
 Finally, plaintiffs point to a May 1989 memorandum from Janet Smith, Personnel, Division of Administrative Services, which advised explicitly that some employees categorized as exempt may really be non-exempt, in violation of the FLSA, and that agencies should be vigilant in updating position descriptions and keeping track of actual hours worked by even exempt employees so that there would be reliable records in the event that exempt employees were declared non-exempt and agencies became liable for back pay overtime compensation.[13] Defendants answer that in May 1989 Janet Smith was with the Department of Employment Relations; that the memorandum was directed to all division administrators within the Department of Employment Relations; that plaintiffs came across the memorandum in the files of Diane Harmelink during discovery; that Ms. Harmelink brought the memorandum with her when she came to the lottery board from the Department of Employment Relations in February 1992 after the commencement of the Department of Labor investigation; and that there is no evidence that anyone at the lottery board knew of the memorandum prior to Harmelink's joining the lottery board in February 1992.
 
 
 79
 I need not determine whether defendants' version of events is correct. It is plaintiffs' obligation to put into dispute that defendants acted in good faith or with reasonable grounds when they did not pay overtime compensation to plaintiffs while plaintiffs were classified as exempt employees. They have failed to do so. Accordingly, summary judgment will be granted to defendants on this issue.
 
 3. Willful violation of the FLSA
 
 80
 Defendants move also for summary judgment on the ground that they did not willfully violate the Fair Labor Standards Act. 29 U.S.C. § 255(a) provides that an action brought for violation of the FLSA ..." may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." The Supreme Court has clarified the definition of "willful" that is to be applied in determining whether an employer acted willfully. In McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988), the Court held that it is only where an employer actually knows its conduct is in violation of the law or where it acts in reckless disregard for whether the conduct violates the law that an alleged violation can be considered "willful" so as to extend the two year limitations period to three years. Id. at 133, 135. The Court noted that even
 
 
 81
 [i]f an employer acts unreasonably, but not recklessly, in determining its legal obligation, then ... it should not be ... considered [wilful] under ... the ... standard we approve today.
 
 
 82
 Id. at n. 13. The FLSA presumes a two-year statute of limitations unless an employee can show that an employer acted willfully; it is more difficult for plaintiffs to make the showing necessary to extend the statute of limitations than it is to get double damages. Walton v. United Consumers Club, Inc., 786 F.2d at 312. In Wyland v. Dist. of Columbia Gov't, 728 F.Supp. 35 (D.D.C.1990), the court awarded liquidated damages to the plaintiffs in an action under the FLSA, finding that the defendant had failed to act reasonably and in good faith when it decided to treat the plaintiffs as exempt employees. The court refused to extend the statute of limitations from two to three years, however, stating that "a finding of unreasonableness does not alone support a finding of willfulness." Id. at 37. The court noted that the defendant had claimed consistently that the plaintiffs were exempt employees. Id.
 
 
 83
 Plaintiffs offer no evidence that defendants had actual knowledge that they were violating the FLSA. Therefore the question is whether plaintiffs have made a sufficient showing of a reckless violation of the FLSA by defendants. EEOC v. Grady, 857 F.2d 383, 388 (7th Cir.1988).
 
 
 84
 In support of their argument that there are material facts in dispute that preclude a finding on summary judgment that defendants did not willfully violate the FLSA, plaintiffs offer the same evidence that they offered in support of their claim for liquidated damages: defendants' knowledge that plaintiffs were sometimes working more than forty hours per week; defendants' alleged instructions to plaintiffs to fill out "false" time sheets; and the memoranda from Janet Smith and R.D. Markham. Having already decided that these arguments fail to show that defendants acted unreasonably or in bad faith, I will not consider them here where the burden on plaintiffs is greater.[14] In addition, plaintiffs offer the deposition transcript of Cyneth Dahm, in which Dahm answers "That would be a general policy, yes," to the question "So there would have been an intentional, institutional policy decision made by the Wisconsin Lottery to not pay the FSRs overtime...." Dahm dep. at 43.[15] It is clear from the context of Dahm's statement that she is not testifying that defendants deliberately disregarded or violated the FLSA. Immediately before this exchange, Dahm stated, "I can only tell you that the general rule was if you had exempt status, you were not paid overtime." Id. No more can be inferred from her testimony than that defendants had an intentional general policy not to pay overtime to employees who were classified as exempt. An employer does not violate the FLSA by not paying overtime to an exempt employee. Plaintiffs fail to show that defendants acted willfully to violate the statute by not paying overtime to employees classified as exempt.
 
 
 85
 Plaintiffs have not alleged that defendants classified field service representatives initially as exempt employees, knowing that they were not, in an attempt to avoid paying them overtime. As in Wyland, 728 F.Supp. 35, defendants have contended consistently that although they chose not to contest the findings of the Department of Labor that plaintiffs were non-exempt employees, they still consider the issue to be close and undecided. Because plaintiffs have not produced evidence to establish the existence of the elements of their claim that defendants acted willfully to violate the FLSA, summary judgment will be granted to defendants on the statute of limitations issue.
 
 
 86
 4. Effect of statute of limitations on plaintiffs' claims
 
 
 87
 Defendants have reserved the right to submit evidence showing that some or all of the consents filed by plaintiffs Brunmeier, Burt, Danke, Dunst, Engel, Gallenbeck, Greenlee, Hilmes, Raether, and Rentmeester are invalid. Assuming for purposes of this summary judgment motion that the consents are valid, however, defendants request a finding that these plaintiffs are barred from bringing claims based on any actions of defendants that occurred more than two years before each plaintiff filed a consent with the court, pursuant to 29 U.S.C. § 256(a) and (b). It is unclear whether defendants are contending that plaintiffs have chosen to pursue this lawsuit against defendants rather than to accept the offers of back pay overtime compensation that defendants offered, and that because of the statute of limitations some plaintiffs may not be able to collect as much as if they had accepted the amounts the defendants offered, or whether defendants intend this argument to apply only in the event plaintiffs were granted summary judgment on the back pay compensation issues discussed above. Plaintiffs argue that a three year statute of limitations should apply, an argument dispensed with previously; they do not address this contention of defendants specifically.
 
 
 88
 I conclude that defendants are correct, and that no plaintiff may claim compensation for overtime that occurred more than two years prior to his or her filing of a valid consent form with the court. If "the statutory violation does not occur at a single moment but in a series of separate acts and if the same alleged violation was committed at the time of each act, then ... only those violations preceding the filing of the complaint by the full limitations period are foreclosed." Perez v. Laredo Junior College, 706 F.2d 731, 733-34 (5th Cir.1983) (determining that some claims were barred in a § 1983 action because they occurred prior to the period within the statute of limitations).
 
 
 89
 However, the questions remain: are defendants contending that plaintiffs may not accept the offers of back pay that defendants have already made, but rather will receive only the amounts within the statue of limitations as calculated in the manner discussed above; and, if the latter, when did each plaintiff file a valid consent form for purposes of determining the statutory time limit? Plaintiffs Irwin, Skowlund, Mercer, and Sirna filed consents with the initial complaint in this case on August 14, 1991; the earliest date as to which they may claim overtime compensation is August 15, 1989 unless defendants intend to allow them to accept offers already made to them. I cannot determine on the basis of information presently before the court when the two-year limitation began on each of the other plaintiff's claims. A status conference will be held to determine defendants' intentions regarding plaintiffs' back pay awards. No such conference need be held, however, if defendants advise the court and plaintiffs' counsel in writing that the offers of back pay made previously to plaintiffs remain open.
 
 B. Breach of Contract
 
 90
 Defendants move for summary judgment on the claims of plaintiffs Irwin, Mercer, Sirna, Skowlund, Danke, Dunst, Engel, Gallenbeck and Hilmes that defendants breached employment contracts that they entered into with plaintiffs before plaintiffs began working for the lottery board.[16] Plaintiffs allege that they were promised that they could begin their retail routes and lottery operations from their homes; that their homes would be designated as their "home bases" so that plaintiffs could begin and end their work days at their homes; that they were promised the use of state vehicles in the performance of all of their employment duties; and that they were promised that lottery tickets and other sales materials would be delivered to their homes. Plaintiffs contend that defendants breached the employment contracts by changing the "home base" designation from plaintiffs' residences to their district offices and by changing the terms and conditions of employment pertaining to plaintiffs' use of state-owned vehicles. Plaintiffs allege also that defendants have threatened to breach their employment contracts by reclassifying and downgrading the field service representative positions to motor vehicle operators or delivery personnel positions.
 
 
 91
 Plaintiffs' contention that defendants agreed to designate plaintiffs' homes as their home bases or work sites bears on whether plaintiffs should receive compensation for time traveled between their homes and their district offices or first and last retail appointments each day.[17] Although the FLSA does not consider travel time between an employee's home and work station to be compensable time, the statute does allow for a contractual agreement otherwise. 29 U.S.C. § 254(b)(1).
 
 
 92
 In support of their motion for summary judgment on this contract issue, defendants argue that plaintiffs' appointment letters state that their headquarters cities are where their district offices are, that plaintiffs are contending that only some rather than all of them entered into these alleged contracts, and that state law prohibits agencies from entering into employment contracts beyond the authority granted them by the state legislature.
 
 
 93
 It is the burden of plaintiffs in a summary judgment action to "make a showing sufficient to establish the existence of an essential element on which [the plaintiff] will bear the burden of proof at trial, or else summary judgment for the opposing party is proper." Celotex, 477 U.S. at 322. In support of their opposition to defendants' motion for summary judgment, plaintiffs provide lottery expense sheets, approved by plaintiffs' supervisors, on which plaintiffs have written in their home cities as their home bases or stations. In addition, plaintiffs contend again that they were required to do some substantive work at home. Beyond these submissions, plaintiffs provide only their sworn statements that they entered into employment contracts with defendants in which the alleged promises were made.
 
 
 94
 The lottery expense sheets do not suffice to establish that such an employment contract existed. The purpose of the expense sheets was to log expenses for purposes of reimbursement; it would be inferring too much to conclude from a supervisor's signature on an expense sheet at the top of which a plaintiff has written his home city rather than his headquarters city evidence of a contract in which defendants agreed that a plaintiffs' residence was to be considered his home base. Plaintiffs offer no evidence that any supervisor who signed an expense sheet was involved in the making of a contract or intended a signature on an expense log to signify anything other than approval of the expenses listed.
 
 
 95
 Neither do plaintiffs meet their burden by alleging that they performed substantive work at home. Many salaried employees perform work at home, either on their own or by direction of an employer. By itself, this does not indicate that defendants had promised that plaintiffs' residences were to be their home bases.
 
 
 96
 That leaves only plaintiffs' averments that defendants had entered into the alleged contracts. Even if these averments alone raised a material factual dispute sufficient to withstand summary judgment, plaintiffs face a hurdle they cannot overcome: that state law prohibits agencies from entering into contracts extending beyond their authority. "[A]n administrative agency has only those powers which are expressly conferred [by the legislature] or which are fairly implied from the ... statute under which it operates." Fiedler Foods, Inc. v. Wis. Dep't of Revenue, 142 Wis.2d 722, 726, 419 N.W.2d 311 (Ct.App.1987). Where there is a reasonable doubt that an agency has been granted power by implication, that doubt must be resolved against the implied grant. Kimberly-Clark Corp. v. Public Service Comm'n, 110 Wis.2d 455, 462, 329 N.W.2d 143 (1983).
 
 
 97
 Wis.Stat. § 20 sets out the appropriations and budget management rules for Wisconsin state agencies. Section 20.916(9) covers reimbursement for travel expenses. The statute defines "Headquarters City" as including "the area within the city or village limits, if any, where an employee's permanent work site is located and the area within a radius of 15 miles from the employee's permanent work site." Wis.Stat. § 916(9)(a)(2). Section 916(9)(e) implies that an employee's residence is not to be considered the employee's work site:
 
 
 98
 Expenses in an employee's headquarter city. Employees who are headquartered in a city in which the expense occurs shall be reimbursed for their actual, reasonable and necessary expenses incurred in the discharge of official duties only on the approval of the head of the employee's agency. This does not apply to travel between an employee's residence and the city in which he is headquartered, which shall not be reimbursable.
 
 
 99
 Plaintiffs' appointment letters stated that their headquarters cities were their district offices. The statute provides that travel between a state employee's residence and the city in which the employee is headquartered is not reimbursable. Plaintiffs have pointed to no express or implied grant of authority that would permit the lottery board to contract with some of its employees for terms contrary to those in § 916(9)(e).
 
 
 100
 On the other hand, defendants point out that the lottery board has stringent obligations imposed on it by the legislature to monitor its expenses carefully. The statute under which it operates limits the lottery board to spending no more than fifteen percent of its gross revenues each year for expenses of the operation and administration of the board. Wis.Stat. § 25.75(3). Approximately five percent of the fifteen percent limit is earmarked as compensation to the retailers who sell lottery tickets; thus the lottery's other expenses, including pay for employees, is statutorily limited to ten percent of gross lottery revenues. Wis.Stat. §§ 25.75(1)(b) and (3)(b); 565.14(b). The balance of the gross lottery revenues is to be distributed for property tax relief, Wis.Stat. § 25.75(3)(c); the lottery board has an explicit fiduciary duty to the public to monitor its expenses carefully and to distribute funds for property tax relief. The statutes require frequent audits of the lottery board and reports by it, Wis.Stat. § 565.37, and a biennial report to the legislature "on the effects on the operation of the lottery of the fifteen percent expense limitation, Wis.Stat. § 565.45. The implication to be drawn from this perusal of the statutes governing the lottery board is that the legislature intended to control the board's spending, and that compensation of board employees should remain within the express parameters of § 916(9). There is no room for concluding that the legislature implied that the lottery board was authorized to contract with its employees for terms in excess of those in the statute.
 
 
 101
 If defendants entered into contracts that they were not authorized to make, the contracts are invalid and unenforceable. See, e.g., Glendale Prof. Policemen's Ass'n v. Glendale, 83 Wis.2d 90, 106, 83 N.W.2d 594 (1978) (holding that collective bargaining agreements and statutes governing conditions of employment must be harmonized whenever possible, and that when an irreconcilable conflict exists, the collective bargaining agreement should not be interpreted to authorize a violation of law). See also, State Dept. of Admin. v. ILHR, 77 Wis.2d 126, 140, 252 N.W.2d 353 (1977) (finding an agency administrative rule that exceeded the authority of the agency's grant of power to be "void ab initio"). See also, Nelson v. City of Superior, 109 Wis. 618, 621-23, 85 N.W. 412 (1901) (finding that a plaintiff was not estopped from bringing an action to recover a salary set by statute even though he had agreed contractually to a lesser salary because the contract was contrary to the statute and to public policy). I conclude that even if defendants entered into contracts that permitted some plaintiffs to consider their residences to be their work sites, so that they could count time traveled from their homes to their district offices as compensable time, the contracts are void under state law and so unenforceable.
 
 
 102
 The same analysis disposes of plaintiffs' claim that they were promised the use of state-owned vehicles to drive between their homes and their work sites or headquarters cities without compensating the state for the use of the vehicles. Wis.Stat. § 16.04(1)(a) grants to the Department of Administration the authority to establish guidelines for the use of state-owned vehicles. The guidelines the department has established state, in part:
 
 
 103
 C. Permitted and Prohibited Uses of State Vehicles.
 
 
 104
 1. Nonbusiness Mileage: ... Pool and functional pool vehicles may not be used for nonbusiness mileage. Nonbusiness miles when authorized must be reimbursed to the state each month at the rate established by statute plus state sales tax, and in accordance with procedures established by the owning agency.... Miles driven to and from home are considered nonbusiness miles unless they clearly contribute to the efficiency of the trip. The considerations given by the driver to the efficiency of the trip should include, but not be limited to, factors such as the most direct routing and the most efficient use of the employee's time....
 
 
 105
 State of Wisconsin Fleet Policies and Procedures, Dep't of Administration, Aug. 1984. The lottery board promulgated its own vehicle use rules as part of its Sales Representative Manual in August 1988:
 
 4.1.1 Use of Vehicle
 
 106
 Incorporated in the Field Sales Representative training manual is a copy of the official State of Wisconsin Fleet Policies and Procedures. All policies and procedures must be adhered to including the below listed Wisconsin Lottery fleet rules and regulation.
 
 
 107
 Under no circumstances is a Wisconsin Lottery vehicle to be used for personal use. This includes commuting to and from your official work station. Cars are to be left at the District Sales Offices at night and on weekends, holidays, etc.
 
 
 108
 If a circumstance arises, in which you need to drive your state vehicle home, it will need to be cleared in advance by your District Sales Supervisor. Your supervisor will give you specific criteria regarding your use of your state vehicle if these circumstances do arise.
 
 
 109
 Each plaintiff received a copy of the state-wide vehicle policy and the sales representative manual containing these provisions upon or shortly after being hired; each plaintiff signed a "State of Wisconsin Pool and Functional Pool Vehicle Use Agreement" that acknowledged that plaintiff either had read or reviewed the provisions. In August each plaintiff attended a presentation by Gerald Ziegler, fleet manager for the Wisconsin Department of Administration, in which Ziegler reiterated the provisions of the state fleet policy, including the limitations on travel between home and work. Even if defendants contracted to allow plaintiffs to drive their state-owned vehicles between their homes and their district offices without reimbursing the state, this contract was in direct contravention of state and lottery board regulations, and plaintiffs were aware that it was. Because defendants had no authority to enter into such contracts, the contracts are void and unenforceable. The fact that plaintiffs were allowed to drive the vehicles to and from their homes for a period of time in violation of state regulations does not mean that they have the right to continue to do so.
 
 
 110
 When a contract is unenforceable, courts are to leave the parties where they find them. Kryl v. Frank Holton Co., 217 Wis. 628, 631, 259 N.W. 828 (1935). If an agreement is prohibited by law, "no recovery may be had under it." Id. Without the purported contract in this case, the parties are left with the employment guidelines found in state statutes, agency guidelines, and the appointment letters: plaintiffs may not count as compensable the time they spend driving between their homes and their district offices or first and last retail appointments, and plaintiffs may not use state-owned vehicles to drive to their homes without specific permission and without reimbursing the state.
 
 
 111
 I will grant defendants' request for summary judgment on the claim that defendants breached their contract with plaintiffs by threatening to downgrade the field service representative classification to delivery personnel positions. Plaintiffs have proposed no facts or affidavits to support their claim that such a threat was made. Because plaintiffs have failed to make a showing sufficient to establish the existence of an essential element on which they would bear the burden of proof at trial, summary judgment for defendants is appropriate. Celotex, 477 U.S. at 322.
 
 C. Retaliation
 
 112
 Plaintiffs allege that defendants have retaliated against them for filing this lawsuit in violation of 29 U.S.C. § 215(a)(3). Section 215(a)(3) states that it is unlawful for any person
 
 
 113
 to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.
 
 
 114
 Plaintiffs contend that defendants discriminated against them for filing the lawsuit by eliminating geographical drop-off sites for lottery fleet vehicles, thereby requiring all state vehicles to be returned to district offices at the end of each scheduled retail route and increasing the number of miles plaintiffs had to drive on their own time and money at the beginning and end of each route. In addition, plaintiffs contend that plaintiff Rentmeester was removed from her route and assigned to other out-of-town routes in retaliation for joining the suit.
 
 
 115
 Plaintiffs have offered no proposed findings of fact in support of their retaliation allegations, but rather offer conclusory statements in their affidavits. Courts have recognized that the ultimate fact of retaliation can rarely be supported by direct evidence of intent, but have found bare allegations of the ultimate fact of retaliation insufficient. Benson v. Cady, 761 F.2d 335, 342 (7th Cir.1985); see also Murphy v. Lane, 833 F.2d 106, 108 (7th Cir.1987). Plaintiffs state in their affidavits that defendants' elimination of drop-off sites for state-owned vehicles affected plaintiffs much more adversely than non-plaintiff lottery employees. However, plaintiffs do not give any specific facts in support of this conclusory statement. In addition, plaintiffs do not allege that they were treated differently from any other state employees after defendants eliminated the drop-off sites; rather, it appears that the change brought plaintiffs and other lottery employees under the same practices that applied to all other state employees. The fact that defendants required plaintiff and non-plaintiff lottery board employees to come into compliance with state law falls far short of a showing sufficient to show the existence of retaliation that plaintiffs are required to make in order to defeat defendants' motion for summary judgment.
 
 
 116
 Defendants argue that they eliminated the drop-off sites because they discovered that they were required to pay employees for the time spent driving between their district offices and the drop-off sites. In fact, defendants offered back pay overtime compensation to plaintiffs Irwin, Skowlund, and Dunst for the period between July 1, 1991 and October 14, 1991 when the drop-off site policy was in effect. Defendants began their policy changes regarding field service representatives' leaving state-owned vehicles at places other than their district offices in June of 1991, when lottery board sales director Donald Walsh issued a memorandum to the effect that all state-owned vehicles would have to be returned to district offices or the drop-off sites at night. The memorandum was issued before this lawsuit was filed; plaintiffs do not claim that this policy change was a retaliatory action. Although the elimination of the drop-off sites occurred after the suit was filed, it appears to be a continuation of the efforts of the lottery board to come into compliance with state policy regarding use of state-owned vehicles, in order to avoid giving up control of its fleet. This, along with plaintiffs' failure to show that the change in policy discriminated against them, defeats plaintiffs' claim that elimination of the drop-off sites was a retaliatory action.
 
 
 117
 Plaintiff Rentmeester contends that defendants retaliated against her by taking her off her retail route and assigning her to various out-of-town routes. Again, plaintiffs offer no proposed facts or specific statements in support of their conclusion that defendants changed plaintiff Rentmeester's route in order to retaliate; rather, plaintiffs assert in their briefs that the reasons defendants gave for changing the route were pretextual. In order to make out a prima facie case of retaliation in violation of § 215(a)(3), a plaintiff must show that there was a statutorily protected activity in which she engaged, that an adverse employment action occurred, and that there was a causal connection between the two. Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 876 (2d Cir.1988) (applying the three-step test set out for cases of racial discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); Jones v. Westside-Urban Health Center, Inc., 760 F.Supp. 1575, 1580 (S.D.Ga.1991); Pedreyra v. Cornell Prescription Pharmacies, Inc., 465 F.Supp. 936, 947-48 (D.Colo.1979) (applying the McDonnell Douglas three-step test to retaliation claims under § 215(a)(3)). Plaintiff Rentmeester fails to make out her prima facie case. Certainly the activity in which she engaged, joining this lawsuit, is a protected activity under the statute. However, she has provided no factual support from which an inference can be drawn that an adverse employment action occurred. All that she alleges happened was that the route she was on was exchanged for another. She does not show that the new route was inferior or more difficult in any way from the one she had; she does not show that she worked longer hours on it or that her pay was reduced. She does not show that she had to drive further from her home to her district office. The route she was assigned to was a route already covered by another lottery employee; there is no showing that defendants made that route any more onerous when they assigned plaintiff to it. Plaintiff Rentmeester has not made a showing sufficient to establish the existence of an essential element on which she would bear the burden of proof at trial. Summary judgment will be granted to defendants on this retaliation issue.
 
 
 118
 Finally, plaintiffs contend that defendants violated their First Amendment rights and their rights under the Wisconsin Constitution and the state's "whistleblower" statute, Wis.Stat. § 895.65, by issuing the August 22, 1991 memorandum that directed lottery employees to direct all communications regarding issues in this lawsuit to the lottery board attorneys.[18] Defendants move to dismiss this claim or for summary judgment on it because plaintiffs have not alleged that a matter of public rather than private concern was at issue when the memorandum was released.
 
 
 119
 A public employee "does not relinquish his First Amendment rights when he join[§ a department], but he implicitly agree[s] that his rights to speech c[an] be balanced against the [department's] interest in running an efficient Department." Breuer v. Hart, 909 F.2d 1035, 1037 (7th Cir.1990) (citing Pickering v. Board of Educ., 391 U.S. 563, 568, 574 (1968)). In Pickering, the Supreme Court held that public employees do not give up their First Amendment right to comment on matters of public interest by virtue of their government employment. Pickering, 391 U.S. at 568. If a public employee speaks out on matters of public interest, that speech is protected under the First Amendment. However, the Court of Appeals for the Seventh Circuit
 
 
 120
 has recently reaffirmed its stance that even though an expression may inherently deal with a matter of public concern, the Connick test requires [a court] to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise issues of public concern, because they are of public concern? Or was the point to further some purely private interest?
 
 
 121
 Barkoo v. Melby, 901 F.2d 613, 618 (7th Cir.1990) (citing Connick v. Myers, 461 U.S. 138 (1983)) (other citations omitted). Plaintiffs' failure to contend that their speech involved a matter of public concern or that they were speaking out in order to alert the public to a matter of public concern takes their speech outside of the realm protected by the First Amendment.
 
 
 122
 Plaintiffs allege that the August 22 memorandum was issued in retaliation for their having filed this lawsuit. What plaintiffs fail to show is how the memorandum is retaliatory. On its face, the memorandum does not limit plaintiffs' ability to speak out about any issues of the case, whether of public or private concern. It does not threaten plaintiffs or punish plaintiffs for speaking out. The memorandum simply directs lottery employees to address all questions or concerns to the lottery board's attorneys in order to "assure that such inquiries are answered as effectively and consistently as possible without interfering with ongoing operations and without jeopardizing the Board's proper representation in the lawsuit." Plaintiffs have failed to make out a First Amendment claim because they have failed to show that they were speaking on matters of public concern or that defendants retaliated against them for speaking out. Plaintiffs do allege that "this restrictive order clearly goes beyond defendants' ostensible reasons for its issuance, namely, to have questions about the lawsuit referred to plaintiffs' and defendants' respective counsel" and that "as a result of the penalizing effects of this prohibitive memorandum, plaintiffs have been isolated and ignored by numerous co-employees." Plaintiffs' brief in opposition to defendants' motion for summary judgment at 22. Plaintiffs offer no explanation of how the memorandum goes beyond its "ostensible reasons" for issuance or any explanation of what the "penalizing effects" are or how the memorandum was responsible for plaintiffs' being isolated or ignored by other employees. Because plaintiffs fail to make out a First Amendment claim, they fail also to make out a claim under the Wisconsin Constitution or Wis.Stat. § 895.65. See, e.g., State v. Panno, 151 Wis.2d 819, 830-31, 447 N.W.2d 74 (Ct.App.1989) (looking to parameters the Supreme Court has placed on the First Amendment in determining state constitutional claims); Wis.Stat. § 895.65 (requiring a violation of an employee's First Amendment or state constitutional rights in order to find a violation of the statute). Defendants' motion for summary judgment will be granted on plaintiffs' free speech claim.[19]
 
 ORDER
 
 123
 IT IS ORDERED that defendants' motion to dismiss James Caveney and all unnamed plaintiffs from this suit is GRANTED.
 
 
 124
 IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment on the issue of defendants' admission of liability for overtime compensation and defendants' motions to dismiss and for summary judgment as to the times before which each plaintiff is barred from receiving overtime compensation are DENIED. A status conference will be held at 11:00 a.m., Thursday, May 7, 1992 to determine defendants' intentions as to plaintiffs' back pay awards, unless defendants advise the court and opposing counsel no later than May 5, 1992, that the back pay offers remain open.
 
 
 125
 FINALLY, IT IS ORDERED that defendants' motion for summary judgment on all remaining issues is GRANTED.
 
 
 
 [1]
 Plaintiffs do not argue that this court's summary judgment decision contained errors of law or fact
 
 
 [2]
 The original due date of March 16, 1992, set at the pretrial conference, was extended to March 18, 1992
 
 
 [3]
 Plaintiffs assert that defendants were dilatory because although plaintiffs requested the vehicle log forms in November 1991, defendants did not provide them until early March 1992. However, plaintiffs assert also that they were keeping careful inventory of the materials that they had asked for, and that the vehicle logs were among those materials. Yet plaintiffs did not file a Fed.R.Civ.P. 37(a)(2) motion to compel defendants to produce the logs. If plaintiffs knew in November 1991 that the logs existed, knew that defendants had not produced them, and failed to file a motion to compel production, they are hard pressed now to assert that they were diligent in their attempts to produce the evidence during the pendency of the motion for summary judgment
 
 
 [4]
 On April 28, six weeks after the deadline for plaintiffs' brief in response to defendants' motion for summary judgment but before the motion had been decided, plaintiffs submitted several vehicle logs to support their contention that material factual disputes existed. Even at that late date in the proceedings, I considered the vehicle logs and determined that they failed to raise a factual dispute as to whether reliable records existed from which defendants could have calculated actual overtime hours worked or as to whether defendants had agreed to consider some plaintiffs' residences as their district offices. Opinion of April 30, 1992, p. 53, n. 19. Plaintiffs did not submit any documents from the March 6 Dahm deposition with their April 28 submissions of the vehicle logs
 Plaintiffs did file two motions to compel during the proceedings of this case. The first was in October 1991, requesting disclosure of the names of the field service representatives who had worked for defendants. The second motion was filed on March 27, 1992; it requested disclosure of time records. At a hearing conducted the same day, I ruled that the motion was incomplete because it did not include an affidavit showing compliance with this court's Local Rule 3, and that if the affidavit were filed by April 6, 1992, the motion would be heard at a hearing on April 8. Plaintiffs did not file the affidavit.
 
 
 [5]
 The documents that Dahm produced at her deposition were the subject of the same request of plaintiffs and the same objection by defendants
 
 
 [6]
 "[S]ummary judgment will be granted against a party if after reasonable discovery he continues to be unable to identify specific genuine issues of material fact but desires to keep trying. As one court has stated: "All things must end--even litigation.' " Wright, Miller & Kane, § 2741
 
 
 [1]
 Plaintiffs and defendants offer as a proposed finding of fact that plaintiffs refused an offer of overtime compensation for the period of January 1, 1989 through June 14, 1991. In addition, defendants offer a proposed finding of fact that they have been paying overtime compensation to field service representatives on the basis of actual time worked since June 14, 1991, a finding that plaintiffs did not dispute by responding to defendants' proposed findings of fact as required by this court's "Procedure to be Followed on Motions for Summary Judgment," copies of which were provided to both parties. In the affidavits that plaintiffs cite in support of the fact that they have not been paid overtime from August 1, 1988 to the present, certain plaintiffs state that "[f]rom August 1, 1988, to the present, your affiant, has on numerous occasions, worked on behalf of the Wisconsin State Lottery in excess of 40 hours per week at the direction of his employer without being paid overtime compensation...." Irwin aff., p 4; Mercer aff., p 4; Sirna aff., p 4; Skowlund aff., p 4. For the purpose of deciding these motions, I will read all of these proposed facts together and assume that "on numerous occasions" does not include any occasions between June 14, 1991, when defendants began paying overtime for actual time worked, and August 14, 1991, when this lawsuit was filed
 In their brief in opposition to defendants' motion for summary judgment, plaintiffs contend that plaintiff Sirna was not paid for 1.7 hours of overtime during the period of January 25, 1992 to February 6, 1992; however, plaintiffs did not dispute defendants' proposed fact that defendants have been paying overtime on the basis of actual time worked since June 14, 1991 and plaintiffs did not offer a proposed fact of their own that plaintiff Sirna was not paid for overtime in early 1992. (Defendants contend that plaintiff Sirna was paid for this time.) Facts argued only in a brief need not be considered by this court. "Procedure to be Followed on Motions for Summary Judgment," § V.D.; see also "Helpful Hints for Submitting Proposed Findings of Fact," attached to the procedures guideline ("Do not state as 'fact' in your brief any fact not proposed and supported in your proposed findings of fact.") In any event, a dispute about whether one plaintiff was paid for 1.7 hours of overtime in 1992 is immaterial to how much back pay compensation is owed for the period of January 1, 1989 to June 14, 1991.
 
 
 [2]
 Neither party proposed this fact; I have drawn it from the memorandum that the lottery board sent to its employees advising them of how their back pay overtime compensation awards were calculated. Plaintiffs included several copies of the memorandum with various affidavits that they submitted. In addition, defendants have proposed a fact, undisputed by plaintiffs, that the Department of Labor directed defendants how to calculate back pay awards and approved the calculations once made. Finally, plaintiffs request liquidated damages as a remedy in this lawsuit; from this it appears that the Department of Labor did not order defendants to pay liquidated damages
 
 
 [3]
 Avis Mosby was dropped as a plaintiff in this suit by agreement of counsel in a hearing conducted on April 23, 1992
 
 
 [4]
 Plaintiffs have moved for partial summary judgment, requesting a holding that defendants' offer of back pay for overtime that resulted from these calculations constituted an admission of liability. The only factual bases plaintiffs offer in support of their motion are that defendants chose not to contest the finding of the Department of Labor that plaintiffs were owed back pay and that defendants tendered checks for back pay. In disputing that they have admitted liability for back pay, defendants point out that the "Notice to Employees" that accompanied the back pay offers stated that "[b]y offering this check, neither the State of Wisconsin nor the Wisconsin Lottery are making any admission of liability under the FLSA." By itself, this fact is sufficient to put into dispute whether defendants have admitted liability, and sufficient to defeat plaintiffs' motion for partial summary judgment. In any event, it is unclear how a finding for plaintiffs on this issue would advance their cause in this suit. Plaintiffs' principal claim is that defendants miscalculated the amount of back pay they offered. Whether defendants admit or do not admit liability is irrelevant to the method of calculation of the back pay awards
 
 
 [5]
 Plaintiffs are reminded that it is not this court's practice to sift through the record for facts in support of claims that parties make. "Procedure To Be Followed on Motions for Summary Judgment," § V.D
 
 
 [6]
 Some plaintiffs did produce copies of their records in response to defendants' request for production of documents. Because plaintiffs did not offer proposed facts based on these records, however, they failed to put them into evidence for purposes of this summary judgment motion. Defendants have not had a chance to address the validity or the relevance of the records, and could assume safely that plaintiffs did not intend to use the records because they did not propose the existence of the records as fact or introduce them in connection with their response to defendants' summary judgment motion. In addition, the records themselves include only gross numbers of hours for days and weeks; there are no indications of what activities plaintiffs were engaged in during those hours. As plaintiffs argue that the time they spent driving between their homes and their district offices was compensable, for instance, it would be essential to know whether the hours listed in the records included this driving time, and if so, how many. Plaintiffs have not put the records into evidence at all, much less supported their conclusory allegations that the records are reliable
 
 
 [7]
 Defendants admit that the employee records they kept were unreliable as to the numbers of hours each field service representative worked each week. This was because defendants considered the field service representatives to be exempt employees; 29 C.F.R. §§ 516.2(7) and 516.3 provide that employers are not required to keep records of hours worked each workday and total hours worked each workweek by exempt employees
 
 
 [8]
 Plaintiffs' brief in opposition to defendants' motion for summary judgment contains an allegation that "the time period utilized by defendants in calculating overtime compensation is seriously suspect in light of the fact that plaintiffs, at the direction of the defendants were instructed to fill out 'false' time reports which reported only 40 hours per week, even though many additional overtime hours were worked." Plaintiffs did not offer this statement as a proposed finding of fact, and do not provide in their brief any details about who instructed them to fill out false time reports, when they were instructed to do so, or the time period to which they refer. "The time period utilized by defendants in calculating overtime compensation" would seem to refer to the test period from which overtime hours were extrapolated; however, that does not make sense because if plaintiffs claimed to work 40 hours per week during the test period, the test period would have shown no overtime compensation due. If plaintiffs refer to the period before the test period began, when plaintiffs were considered to be exempt salaried employees, there was no reason for defendants to be keeping records of hours actually worked by plaintiffs. Because plaintiffs did not offer this allegation as a proposed fact and offer no evidence to substantiate the claim, and because the allegation is irrelevant to the time before the test period and meaningless during the time period, the allegation will be disregarded
 
 
 [9]
 29 C.F.R. § 548.301 provides as to salaried employees:
 (a) Section 548.3(a) authorizes as an established basic rate: "A rate per hour which is obtained by dividing a monthly or semi-monthly salary by the number of regular working days in each monthly or semi-monthly period and then by the number of hours in the normal or regular workday. Such a rate may be used to compute overtime compensation for all the overtime hours worked by the employee during the monthly or semi-monthly period for which the salary is paid.
 
 
 [29]
 C.F.R. § 548.2(f) provides:
 Overtime hours are compensated at a rate of not less than one and one-half times such established basic rate.
 
 
 [29]
 C.F.R. § 778.113(a), cross-referenced in § 548, provides the same method of calculation for weekly salaried employees:
 If the employee is employed solely on a weekly salary basis, his regular hourly rate of pay, on which time and one-half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate.
 
 
 [10]
 A contract between employer and employee can alter this statutory assumption. In the section of this opinion addressing plaintiffs' breach of contract claims I have considered whether defendants agreed contractually to pay plaintiffs for the driving time between their homes and district offices
 
 
 [11]
 Plaintiffs make much in their arguments of the fact that plaintiffs worked weeks of more than forty hours and that defendants knew that plaintiffs worked more than forty hours during some weeks. As defendants point out, there is no dispute about this fact, but it is irrelevant to the issues of this case. The issue is not whether plaintiffs should have been considered salaried employees during the time for which overtime compensation is in dispute. The Department of Labor has determined that they should not have been so considered, and defendants have chosen not to contest that determination; the issue is moot. The fact remains that defendants did consider plaintiffs as exempt salaried employees during the time in dispute, and so whether they knew plaintiffs were working more than forty hour weeks is immaterial
 
 
 [12]
 Neither party proposed any fact associated with this memorandum. However, both parties discuss it in their briefs and provide a copy of it with their exhibits. Therefore, in the interest of a complete discussion of the issues of this lawsuit, I have considered it in this opinion
 
 
 [13]
 As with the Markham memorandum discussed in the preceding paragraph, neither party proposed any facts regarding this memorandum. Again, however, both parties discuss the memorandum in their briefs and provide a copy of it in their exhibits
 
 
 [14]
 I note once again that plaintiffs have not offered any of these arguments as the subjects of proposed findings of fact
 
 
 [15]
 Defendants object to plaintiffs' use of the Dahm deposition because they have not had a chance to cross-examine Dahm; the deposition was adjourned by plaintiffs before cross-examination. Because the Dahm testimony is not sufficient to support an inference that defendants acted to willfully violate the FLSA, I will address the substance of the testimony as if the deposition had been completed
 
 
 [16]
 In this section of the opinion, the term "plaintiffs" will refer only to these plaintiffs who bring the contract claim
 
 
 [17]
 Plaintiffs have not proposed as fact, have not alleged in their briefs, and have not averred in their affidavits that they were not paid for the work that they did at home. Because they were considered exempt salaried employees who were not paid by the hour, the question whether they worked hours at home is immaterial in any event. The only import that I can attach to plaintiffs' contract claim is that it addresses whether defendants were required to count travel time during the test period for figuring back pay compensation and are required to pay actual overtime for such travel time now, and whether plaintiffs should be permitted to keep state-owned vehicles at their homes overnight
 
 
 [18]
 Section 895.65(2) states in pertinent part:
 An employee may bring an action against his or her employer ... if the employer retaliates ... against the employee because the employee exercises his or her rights under the First Amendment to the U.S. Constitution or Article I, Sec. 3 of the Wisconsin Constitution by lawfully disclosing information or because the employer ... believes the employee so exercised his or her right.
 
 
 [19]
 On April 28, 1992, seven weeks after defendants produced them and six weeks after the deadline for motions, plaintiffs submitted several vehicle logs in support of their arguments that defendants had agreed to consider some plaintiffs' residences as their district offices and that reliable records existed from which defendants could have calculated actual overtime hours worked by plaintiffs. The submissions fail to raise a factual dispute in regard to either issue
 As stated in this opinion, even if I were to infer from the vehicle logs that defendants had agreed to designate plaintiffs' residences as their district offices, that agreement was void because it violated state law. Furthermore, the logs do not put into dispute defendants' contention that there existed no more reliable calculation method of actual hours worked by plaintiffs than the method ordered by the Department of Labor. The logs submitted by plaintiffs record miles driven, not hours worked. By plaintiffs' own description the logs include miles driven between plaintiffs' homes and their district offices or first or last appointments, which are miles that were not to be included in the calculation of overtime pay. There is no indication in the logs of how many of the miles driven were actually non-business miles. Plaintiffs offer no explanation why extrapolating hours worked from these records would be more reliable or accurate than extrapolating hours from a test period.
 Because plaintiffs' submissions of April 28 fail to raise a material dispute whether there exist reliable records of actual overtime hours worked by plaintiffs or whether defendants agreed that plaintiffs' residences would be designated as their district offices, the submissions have no effect on the outcome of this opinion.